**No. 13-2365**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff-Appellant,

v.

FREEMAN,

Defendant-Appellee.

*On Appeal from the United States District Court
for the District of Maryland
District Court No. RWT 09cv2573*

**RESPONSE BRIEF FOR APPELLEE**

Donald R. Livingston
W. Randolph Teslik
Hyland Hunt
John T. Koerner
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
Washington, DC 20036
Tel.: 202-887-4000
Fax: 202-887-4288
Email: dlivingston@akingump.com

*Attorneys for Appellee Freeman*

## CORPORATE DISCLOSURE STATEMENT

Freeman is a privately held corporation, with no parent corporation.  No publicly traded entity owns more than 10% of Freeman stock or has a financial interest in the outcome of this matter.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE..................................................................1

    A.   Legal Framework.........................................................................1

    B.   Freeman's Background Investigation Policy ............................3

    C.   Procedural History ......................................................................5

          1.   *The EEOC Investigation* ................................................5

          2.   *District Court Proceedings* ..........................................5

              (a)   Decisions Narrowing the Scope of the EEOC's Claims............5

              (b)   The Discovery Period .............................................6

              (c)   Motions to Exclude and for Summary Judgment ......................9

              (d)   The EEOC's Motion to File a Sur-Reply.................................10

              (e)   The District Court Decision ....................................10

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT .......................................................................................17

I.     STANDARD OF REVIEW ......................................................17

II.    THE EEOC DID NOT PRODUCE RELIABLE EVIDENCE THAT COULD ESTABLISH DISPARATE IMPACT. ...........................................18

    A.   The District Court Properly Exercised Its Discretion To Exclude The EEOC's Expert Evidence. ...................................................19

          1.   *The Expert Evidence Fails Well-Established Principles of Statistical Reliability.*.................................................20

          2.   *The District Court Properly Exercised Its Rule 702 Gatekeeping Function.*..........................................25

    B.   No Reasonable Jury Could Find Disparate Impact From The EEOC's Statistical Evidence, Including The General Population Statistics.............................................................................34

    C.   The District Court Properly Exercised Its Wide Latitude To Control The Timing Of Expert Discovery.............................................37

          1.   *The District Court Properly Exercised Its Discretion to Exclude the Third Murphy Report as Untimely.*..............................37

*2.    The Fourth Murphy Report Was Never Before the District Court Because of the District Court's Unchallenged Denial of the EEOC's Request to File a Sur-Reply.*.........................................44

*3.    The Fourth Murphy Report Is Properly Excluded as Untimely.*.......45

III.  THE EEOC DID NOT MEET ITS BURDEN TO ISOLATE A PARTICULAR EMPLOYMENT PRACTICE THAT CAUSED A DISPARATE IMPACT...................................................................................46

IV.  THE DISTRICT COURT PROPERLY DISMISSED TIME-BARRED CLAIMS...................................................................................................52

A.  The District Court Properly Limited The Liability Period To 300 Days Before The Charge. .........................................................................52

*1.    The EEOC's Litigation Authority Is Subject to the Procedures in Section 706*.....................................................................................52

*2.    The Continuing Violation Doctrine Does Not Apply*.......................58

B.  The District Court Correctly Based Freeman's Criminal History Liability Period On The EEOC's Notice Of An Expanded Investigation. ....................................................................................59

CONCLUSION .....................................................................................................62

ADDENDUM:

42 U.S.C. § 2000e-2(k) ..........................................................................Add. 1a

42 U.S.C. § 2000e-5..............................................................................Add. 3a

42 U.S.C. § 2000e-6...........................................................................Add. 10a

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Allen v. Prince George's Cnty., Md.,
   737 F.2d 1299 (4th Cir. 1984) .......................................................................20

Anderson v. Group Hospitalizations, Inc.,
   820 F.2d 465 (D.C. Cir. 1987).......................................................................31

Anderson v. Westinghouse Savannah River Co.,
   406 F.3d 248 (4th Cir. 2005) ..............................................................2, 18, 50

Arizona ex rel. Goddard v. GEO Group, Inc.,
   No. Civ. 10-1995-PHX-SRB, 2013 U.S. Dist. LEXIS 49277 (D. Ariz.
   Mar. 25, 2013)................................................................................................60

Belk, Inc. v. Meyer Corp., U.S.,
   679 F.3d 146 (4th Cir. 2012) .........................................................................17

Bennett v. Nucor Corp.,
   656 F.3d 802 (8th Cir. 2011) ....................................................................34, 50

Brown v. Nucor Corp.,
   576 F.3d 149 (4th Cir. 2009) .........................................................................25

Burns v. Anderson,
   123 F. App'x 543 (4th Cir. 2004) ..................................................................28

Campbell v. United States,
   470 F. App'x 153 (4th Cir. 2012) ......................................................38, 40, 41

Capaci v. Katz & Besthoff, Inc.,
   711 F.2d 647 (5th Cir. 1983) .........................................................................31

Carpenter v. Boeing Co.,
   456 F.3d 1183 (10th Cir. 2006) .......................................................21, 30, 31

Carr v. Deeds,
   453 F.3d 593 (4th Cir. 2006) .........................................................................17

iv

*Carter v. Lee*,
   283 F.3d 240 (4th Cir. 2002) ............................................................45

*Celotex Corp v. Catrett*,
   477 U.S. 317 (1986)................................................................30, 32

*Chin v. Port Authority of N.Y. & N.J.*,
   685 F.3d 135 (2d Cir. 2012) .......................................................58

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...................................................................19

*Davis v. Cintas Corp.*,
   717 F.3d 476 (6th Cir. 2013) .......................................................48

*Dooley v. Hartford Acc. & Indem. Co.*,
   716 F.3d 131 (4th Cir. 2013) .......................................................17

*Dothard v. Rawlinson*,
   433 U.S. 321 (1977)................................................................35, 51

*Dunning v. Bush*,
   536 F.3d 879 (8th Cir. 2008) .......................................................42

*EEOC v. Fed. Reserve Bank of Richmond*,
   698 F.2d 633 (4th Cir. 1983) ...........................................20, 22, 29

*EEOC v. Gen. Elec. Co.*,
   532 F.2d 359 (4th Cir. 1976) ...................................................60, 61

*EEOC v. Gen. Tel. Co. of NW, Inc.*,
   885 F.2d 575 (9th Cir. 1989) .......................................................31

*EEOC v. Global Horizons*,
   904 F. Supp. 2d 1074 (D. Haw. 2012)........................................56

*EEOC v. Joint Apprenticeship Comm.*,
   186 F.3d 110 (2d Cir. 1999) .......................................................31

*EEOC v. Optical Cable Corp.*,
   169 F. Supp. 2d 539 (W.D. Va. 2001)........................................60

*EEOC v. Princeton Healthcare Sys.*,
   No. 10-4126 (PGS), 2012 WL 5185030 (D.N.J. Oct. 18, 2012) ...................... 60

*EEOC v. Radiator Specialty Co.*,
   610 F.2d 178 (4th Cir. 1979) ................................................................ 35

*EEOC v. Scolari Warehouse Mkts., Inc.*,
   488 F. Supp. 2d 1117 (D. Nev. 2007) .................................................. 57

*EEOC v. Sears, Roebuck & Co.*,
   839 F.2d 302 (7th Cir. 1988) ............................................................... 29

*EEOC v. U.S. Steel Corp.*,
   No. 10-1284, 2012 WL 3017869 (W.D. Penn. July 23, 2012) ......................... 56

*FDIC v. Cashion*,
   720 F.3d 169 (4th Cir. 2013) ............................................................... 45

*Fisher v. Vassar Coll.*,
   70 F.3d 1420 (2d Cir. 1995) ........................................................... 20, 24

*Gallagher v. Southern Source Packaging, LLC*,
   568 F. Supp. 2d 624 (E.D.N.C. 2008) .............................................. 40, 43

*Garcia v. Spun Steak Co.*,
   998 F.2d 1480 (9th Cir. 1993) ..................................................... 2, 28, 30

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ........................................................................... 25

*Hoyle v. Freightliner, LLC*,
   650 F.3d 321 (4th Cir. 2011) ............................................................... 41

*In re Employment Discrimination Litig.*,
   198 F.3d 1305 (11th Cir. 1999) .......................................................... 29

*In re New Bern Riverfront Dev., LLC*,
   No. 09-0340-8-SWH, 2013 WL 4834016 (Bankr. E.D.N.C. Sept. 10,
   2013) ............................................................................................. 43

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ............................................................... 28

*IP Innovation L.L.C. v. Red Hat, Inc.*,
  No. 2:07-cv-447(RRR), 2010 WL 1027479 (E.D. Tex. Mar. 11, 2010)............40

*Keener v. United States*,
  181 F.R.D. 639 (D. Mont. 1998) .................................................................39, 40

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)........................................................................................26

*Lantec, Inc. v. Novell, Inc.*,
  306 F.3d 1003 (10th Cir. 2002) .......................................................................26

*Ledbetter v. Goodyear Tire & Rubber Co.*,
  550 U.S. 618 (2007)........................................................................................53

*Lewis v. City of Chicago*,
  560 U.S. 205 (2010)...................................................................................58, 59

*Luke v. Family Care & Urgent Med. Clinics*,
  323 F. App'x 496 (9th Cir. 2009) ....................................................................38

*Maddox v. Claytor*,
  764 F.2d 1539 (11th Cir. 1985) ...........................................................29, 30, 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................18

*Mayor & City Council of Baltimore v. Unisys Corp.*,
  No. JKB-12-cv-614, 2013 WL 4784118 (D. Md. Sept. 5, 2013)......................43

*McReynolds v. Sodexho Marriott Servs., Inc.*,
  349 F. Supp. 2d 30 (D.D.C. 2004)..............................................................24, 28

*Meacham v. Knolls Atomic Power Lab.*,
  554 U.S. 84 (2008)..........................................................................................46

*Mohasco Corp. v. Silver*,
  447 U.S. 807 (1980)........................................................................................57

*Muñoz v. Orr*,
  200 F.3d 291 (5th Cir. 2000) ...........................................................................27

*Nat'l R.R. Passenger Corp. v. Morgan*,
 536 U.S. 101 (2002)................................................................3, 56, 58, 60

*New York City Transit Authority v. Beazer*,
 440 U.S. 568 (1979).................................................................................36

*Nnadili v. Chevron U.S.A., Inc.*,
 Nos. 02-1620(ESH)(AK), 03-1593(ESH)(AK), 2005 WL 6271043
 (D.D.C. Aug. 11, 2005) ...........................................................................40

*Occidental Life Ins. Co. of Cal. v. EEOC*,
 432 U.S. 355 (1977).................................................................................53

*Paige v. California*,
 291 F.3d 1141 (9th Cir. 2002) ................................................................24

*Payne v. Travenol Labs.*,
 673 F.2d 798 (5th Cir. 1982) .............................................................23, 29

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
 326 F.3d 1333 (11th Cir. 2003) ..............................................................28

*Rink v. Cheminova, Inc.*,
 400 F.3d 1286 (11th Cir. 2005) ..............................................................27

*Scott v. Harris*,
 550 U.S. 372 (2007).................................................................................18

*Serrano v. Cintas Corp.*,
 699 F.3d 884 (6th Cir. 2012) ..................................................................55

*Smith v. City of Jackson, Miss.*,
 544 U.S. 228 (2005).............................................................................46, 49

*Smith v. Western Elec. Co.*,
 770 F.2d 520 (5th Cir. 1985) ..................................................................22

*Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
 318 F.3d 592 (4th Cir. 2003) .............................................................41, 42

*Spaulding v. Wells Fargo Bank, N.A.*,
 714 F.3d 769 (4th Cir. 2013) ..................................................................17

*Stagi v. Nat'l R.R. Passenger Corp.*,
  391 F. App'x 133 (3d Cir. 2010) ................................................................49, 50

*Stout v. Potter*,
  276 F.3d 1118 (9th Cir. 2002) ...............................................................48

*Tagatz v. Marquette Univ.*,
  861 F.2d 1040 (7th Cir. 1988) ...............................................................22

*TFWS, Inc. v. Schaefer*,
  325 F.3d 234 (4th Cir. 2003) ................................................................27, 28

*Thomas v. Metroflight, Inc.*,
  814 F.2d 1506 (10th Cir. 1987) .............................................................29, 30

*Thompson Everett, Inc. v. Nat'l Cable Adv., L.P.*,
  57 F.3d 1317 (4th Cir. 1995) ................................................................18, 30

*Tucker v. Ohtsu Tire & Rubber Co.*,
  49 F. Supp. 2d 456 (D. Md. 1999).........................................................39

*United States v. Allegheny-Ludlum Indus., Inc.*,
  517 F.2d 826 (5th Cir. 1975) ................................................................57

*United States v. Fresno Unified School Dist.*,
  592 F.2d 1088 (9th Cir. 1979) ..............................................................57

*Wards Cove Packing Co. v. Atonio*,
  490 U.S. 642 (1989)................................................................................34, 35

*Watson v. Fort Worth Bank & Trust*,
  487 U.S. 977 (1988)................................................................................*passim*

*Williams v. Giant Food Inc.*,
  370 F.3d 423 (4th Cir. 2004) ................................................................58

*Zellers v. NexTech Ne., LLC*,
  533 F. App'x 192 (4th Cir. 2013) ..........................................................17

STATUTES AND RULES

42 U.S.C.

§ 1981a(a)(1), (c) ..................................................................2
§ 2000e-2(k) ........................................................................34
§ 2000e-2(k)(1)(A)(i) .........................................2, 29, 46, 51
§ 2000e-2(k)(1)(B)(i) ...........................................2, 9, 46, 49
§ 2000e-5(e)(1) .............................................................3, 6, 53
§ 2000e-5(e)(3)(A) .............................................................53
§ 2000e-5(g)(1) .............................................................55, 60
§ 2000e-6(c) ........................................................................54
§ 2000e-6(e) .....................................................3, 53, 54, 55

Civil Rights Act of 1991
§ 105(b), 105 Stat. 1071, 1075 .........................................50

Fed. R. Civ. P. 26 ........................................................41, 44

Fed. R. Civ. P. 26(a)(2)(B)(i) ..............................................39

Fed. R. Civ. P. 26(e) ....................................................38, 41

Fed. R. Civ. P. 26(e)(1) .......................................................38

Fed. R. Civ. P. 26(e)(1)(A) ..................................................38

Fed. R. Civ. P. 37 .................................................................44

Fed. R. Civ. P. 37(c)(1) ...........................................41, 42, 45

Fed. R. Civ. P. 56 .................................................................30

Fed. R. Evid. 702 ..........................................................*passim*

OTHER AUTHORITIES

137 CONG. REC. S15,276 (daily ed. Oct. 25, 1991) ...............50

## STATEMENT OF THE ISSUES

1.  Whether summary judgment was proper:

    a.  Whether the district court properly exercised discretion in excluding the EEOC's expert for fundamental unreliability when the expert constructed an analysis based on manipulated, irrelevant, incomplete, and inaccurate data.

    b.  Whether, given these fundamental irregularities, the EEOC failed to present statistical evidence sufficient for a reasonable jury to find disparate impact.

2.  Whether the EEOC failed to isolate and identify a particular employment practice that causes a disparate impact when it aggregated multiple subjective and objective hiring criteria capable of separation for analysis.

3.  Whether the statute of limitations in Section 706 of Title VII applies to EEOC pattern-or-practice claims when Section 707 expressly subjects those claims to Section 706 procedures.

## STATEMENT OF THE CASE

### A.    Legal Framework

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it unlawful for an employer to use a "particular employment practice that causes a disparate impact on the basis of" race, sex, or other protected characteristics if that practice

1

is not "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). The EEOC must "demonstrate that each particular challenged employment practice causes a disparate impact," except when it can prove "that the elements of a[n employer's] decision-making process are not capable of separation for analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i).

In order to make a *prima facie* case of disparate impact, the EEOC "must do more than merely raise an inference of discrimination"; it "must actually prove the discriminatory impact at issue," *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993), with "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group," *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988) (plurality); *see Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005) ("To establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact."). Courts need not "assume that plaintiffs' statistical evidence is reliable." *Watson*, 487 U.S. at 996. Although an employer may "offer rebutting evidence," it may also simply "impeach the reliability of the statistical evidence" offered by the EEOC. *Id.* Claims of disparate impact must be tried by a bench trial, and not to a jury. *See* 42 U.S.C. § 1981a(a)(1), (c).

2

Under Section 707 of Title VII, the EEOC may "investigate and act on a charge of a pattern or practice of discrimination." 42 U.S.C. § 2000e-6(e). "All such actions shall be conducted in accordance with the procedures set forth in [Section 706 of Title VII]." *Id.* Section 706(e) of Title VII provides that to bring suit, a charge must be filed within, as relevant here, "three hundred days after the alleged unlawful employment practice occurred." *Id.* § 2000e-5(e)(1). "A claim is time barred if it is not filed within these time limits." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

## B.     Freeman's Background Investigation Policy

Freeman is a family-owned company providing services for conventions and other special events. JA-1048. It operates from a headquarters in Dallas, Texas and 38 other offices. JA-462. In 2001, Freeman "began conducting background checks on applicants so that it could better evaluate the trustworthiness, reliability, and effectiveness of prospective employees." JA-1049. Objectives of the policy included limiting exposure to liability and increasing the security of Freeman's employees and assets. JA-1049.

Freeman calibrated its background investigation policy to the type of job. JA-1049; *see also* JA-103-JA-107, JA-276-JA-295. For "general" jobs, Freeman conducted a criminal history investigation. JA-1049. For "credit sensitive" positions—including, for example, jobs requiring access to client or company

3

credit card information—a credit history investigation was also conducted. JA-1049-JA-1050. Finally, for executive positions, education and certification verification was required. JA-1050.

Freeman's criminal history policy was comprised of several distinct criteria. First, untruthfulness regarding a conviction was the only automatic disqualifier. JA-1051. Second, failure to resolve a pending warrant was a strong bar to employment. JA-1051. Third, certain convictions were disqualifying. JA-1050. Generally, Freeman would not hire an applicant who was convicted of a violent crime, destruction of property, sexual misconduct, a drug-related felony, or a job-related misdemeanor within the past seven years. JA-1051. Hiring managers were instructed, however, that "individual circumstances might sufficiently mitigate the seriousness of the finding(s)" such that an applicant could be hired. JA-289.

With respect to credit sensitive positions, an individual's credit history had to be free of, *inter alia*, foreclosure in the past three years, bankruptcy in the past seven years, and any child support delinquency. JA-1052. Freeman provided the applicant an opportunity to dispute any inaccurate information, *see* JA-293-JA-295, and considered mitigating circumstances, JA-289. Prior to July 2006, Freeman had stricter credit criteria. JA-1049 n.1.

In August 2011, Freeman revised its written criminal history criteria to "better reflect[] [the company's] actual practice." JA-648. It also eliminated credit

history investigations. JA-648. The restated criminal history criteria explained that Freeman used a "case-by-case analysis." JA-650. There are no claimants in this case after August 2011. JA-1049 n.2.

### C.    Procedural History

#### 1.    *The EEOC Investigation*

In January 2008, Katrina Vaughn filed a charge with the EEOC alleging that Freeman discriminated on account of race because she was not hired due to her credit history. JA-1052; *see* JA-32 (charge). In September 2008, the EEOC gave Freeman notice that it was expanding the investigation to include Freeman's criminal history criteria. JA-1053; *see* JA-74 (notice).

#### 2.    *District Court Proceedings*

In September 2009, the EEOC sued, claiming that Freeman engaged in a pattern or practice of discrimination. Specifically, the EEOC claimed that since 2001, Freeman's credit history criteria had a disparate impact on African-American applicants, and its criminal history criteria had a disparate impact on African-American, Hispanic, and male applicants. JA-1052-JA-1053.

##### (a)    Decisions Narrowing the Scope of the EEOC's Claims

A series of decisions narrowed the EEOC's claims.

First, the district court dismissed all claims relating to hiring decisions made before March 23, 2007, the date 300 days before the filing of the charge. JA-48-

5

JA-59; *see* 42 U.S.C. § 2000e-5(e)(1).  The court held that the plain text of Section 707(e) requires the EEOC to comply with Section 706 procedures in Section 707 actions, including the charge-filing period.  JA-54.

Second, the district court granted summary judgment to Freeman on the EEOC's criminal history claims prior to November 30, 2007, the date 300 days before the EEOC notified Freeman that it was expanding its investigation.  JA-127-JA-137.

Finally, during the discovery period, the EEOC reached the conclusion that Freeman's criminal history criteria did not have a disparate impact on Hispanics, and dismissed that claim with prejudice.  JA-259-JA-260.

### (b)  The Discovery Period

As part of the EEOC's presuit investigation into Vaughn's charge, Freeman provided two spreadsheets with some data regarding Freeman's credit and criminal history investigations.  JA-1060.  One spreadsheet contained information about applicants who were subject to credit history investigations from January 2005 to mid-October, 2008.  The other contained information about applicants who were subject to criminal history investigations from January 2007 to mid-October 2008, from fewer than half of Freeman's 39 branches.  JA-1060-JA-1061.

During the discovery period, however, and prior to the deadline for the EEOC's expert disclosures, Freeman produced a substantially different, fuller set

6

of records.  Specifically, Freeman produced for the entire period covered by the complaint, *inter alia*: (i) background check logs, listing applicant names, branch, date of background check, the resulting status (hireable or not), and a brief explanation for not hireable results, *see, e.g.*, JA-1266; (ii) EEO datasheets filled out by applicants providing information on race and gender, *see, e.g.*, JA-1264; (iii) reports prepared by the background investigation vendor, *see, e.g.*, JA-1265; (iv) applicant flow logs containing applicant names, application date, job position, branch, race, gender, and application disposition, *see, e.g.*, JA-1267-1268; and (v) adverse action notices sent to applicants who were denied hire due to background information, *see, e.g.*, JA-1269;  JA-1060.

Timely expert disclosure: Under the relevant scheduling order, the EEOC's deadline for expert disclosures was July 18, 2012.  JA-257.  Before that date, the EEOC produced two expert reports.  The first, by Kevin Murphy ("First Murphy Report"), purported to derive and analyze fail rates for Freeman applicants who underwent criminal and credit history investigations.  JA-1198-JA-1261.  Murphy reported that the criminal history criteria had a disparate impact on men and African-Americans and that the credit history criteria had a disparate impact on African-Americans.  JA-1208-JA-1210.  The fail-rate tables indicated that very few applicants failed one of the criminal or credit history criteria.  *See, e.g.*, JA-328 (reporting 36 male applicants not hired due to a criminal history criterion).

7

The second report was by Beth Huebner ("First Huebner Report"). JA-383-JA-434. She claimed to have "review[ed] the data … and replicate[d] the work of Dr. Kevin Murphy," and she reported that she reached the same conclusions regarding the criminal history criteria. JA-386. She also reported that she reviewed general population statistics regarding the likelihood of arrest, felony arraignment, and imprisonment, concluding that men are more likely to be arrested, arraigned, or in prison than women, and that African American and Hispanic men are disproportionately likely to be arrested or in prison. JA-387-JA-393.

Amended expert disclosure: Eight days after its deadline, the EEOC produced an amended report by Murphy, correcting several calculation errors ("Second Murphy Report"). JA-318-JA-381. Although Huebner's report stated that she replicated Murphy's earlier (uncorrected) calculations, the EEOC did not produce an amended report by Huebner replicating the second, amended calculations. JA-1057 n.5.

Under a scheduling order, Freeman's deadline for expert disclosures was November 23, 2012. JA-263. The deadlines in that scheduling order were stayed pending resolution of a motion for intervention and protective order that could have resulted in additional information for Freeman's expert reports. *See* JA-265-JA-267. The deadlines were not reset after the intervention motion was resolved.

### (c)  Motions to Exclude and for Summary Judgment

In December 2012, Freeman moved to exclude the expert testimony of Murphy and Huebner under Federal Rule of Evidence 702, which renders expert testimony inadmissible where it is not based on "sufficient facts or data," is not "the product of reliable principles and methods," or the proffered expert has not "applied the principles and methods reliably to the facts of the case."  Freeman cited evidence showing that the Second Murphy Report was based on manipulated, irrelevant, incomplete, and inaccurate data.  *See* JA-460-JA-466 (Declaration of Freeman's Vice President of Benefits and Compliance, Suzanne Bragg).  In addition, Freeman supplied the declaration of Mary Dunn Baker, a labor economist and applied statistician, evaluating Murphy's methods and concluding that his analyses were not based on sufficient facts or data and were not derived from appropriate applications of statistical methods.  JA-493.

Freeman also moved for summary judgment, contending that Murphy's and Huebner's unreliable evidence could not carry the EEOC's burden of proving disparate impact.  Freeman further argued that the EEOC had entirely failed to identify and isolate the "particular challenged employment practice," 42 U.S.C. § 2000e-2(k)(1)(B)(i), within Freeman's criminal and credit history criteria that caused any disparate impact.

Replacement expert disclosure: In response to Freeman's motions, the EEOC produced a new replacement analysis by Murphy ("Third Murphy Report") that it claimed rendered "moot" all of Freeman's criticisms of the Second Murphy Report, JA-1054-JA-1055.  *See* JA-786-JA-809.

In reply, Freeman pointed again to record evidence demonstrating the continued unreliability of Murphy's analysis.  *See* JA-961-JA-970 (March 2013 Declaration of Suzanne Bragg).

### (d)  The EEOC's Motion to File a Sur-Reply

The EEOC moved to file a sur-reply to the motion to exclude expert evidence.  The EEOC did not proffer a sur-reply brief or exhibits with its motion.

Second replacement expert disclosure:  Nine months after its disclosure deadline, the EEOC served Freeman with yet another new report by Murphy ("Fourth Murphy Report"), as well as a new report by Huebner ("Second Huebner Report").  JA-1307-JA-1322 (Murphy); JA-1325-JA-1331 (Huebner). The EEOC did not file these reports with the district court, but proffered them at the hearing on the motion to exclude as exhibits that would be attached to the EEOC's sur-reply if leave to file one were granted.  JA-1333-JA-1334.

### (e)  The District Court Decision

**1.** The district court granted Freeman's motion to exclude Murphy and Huebner's expert testimony.  The district court first considered the Second Murphy

10

Report and held that there was "such a plethora of errors and analytical fallacies underlying Murphy's conclusions to render them completely unreliable, and insufficient to support a finding of disparate impact." JA-1059. The district court based this holding on the following subsidiary findings:

*First*, Murphy manipulated the data "in an egregious example of scientific dishonesty." JA-1063. Specifically, rather than using the voluminous data Freeman had provided in discovery, he used only the small set of data that Freeman had provided during the 2008 EEOC investigation, but then added 18 hand-picked "fail" observations to his analysis from the discovery records. JA-1061, JA-1063. Given the small number of "fail" observations—for example, the largest set counted 36 men not hired because of failing one of the criminal history criteria, JA-328—his cherry-picking resulted in a "meaningless, skewed statistic." JA-1063.

*Second*, Murphy analyzed irrelevant data. Specifically, Murphy considered data from the older, more stringent credit policy that had not been applied for years prior to the limitations period. JA-1063-JA-1064. There are known applicants who failed one of the criteria under the prior policy but would have satisfied the relevant policy, and vice versa. JA-457. More than 30% of the credit fails reported in Murphy's analysis were under the previous policy. JA-1064.

11

*Third*, Murphy substituted incomplete and irrelevant data for available complete data. JA-1061-JA-1062. Murphy "deliberately ignored" data for the relevant time period. JA-1062. Instead, he examined incomplete data that predominantly covered the pre-limitations period. JA-1061. He constructed a data set for criminal history that overlapped with the liability period for less than a year; included no data—save for the cherry-picked few—from the last three years and nine months of the liability period; and omitted more than half of Freeman's 39 branches. JA-1061; JA-1064. The district court rejected the EEOC's argument that this was proper "background" evidence because it was not a random sample used to extrapolate to other years, but a cherry-picked sample with no attempt to extrapolate from this data to the relevant period. JA-1062; JA-1064.

*Finally*, Murphy's data was highly inaccurate. Murphy miscoded or omitted critical race, gender, and pass/fail data willy-nilly, and double counted applicants. JA-1064-JA-1065. Examining just the subset of the 41 applicants for whom the EEOC intended to seek damages revealed that 9 claimants were double counted (which means more fails) and 8 others were miscoded in terms of race, gender, or pass-fail status. JA-1064; *see also* JA-1277-JA-1278. That alone would be more than a 40% error rate, but in addition Murphy's analysis omitted some claimants entirely, and omitted known race, gender, or result codes for others. JA-1064. The

district court concluded that the EEOC's assertion that the errors were present in the original data "is belied by an examination of that data." JA-1065 n.7.

**2.** Because Huebner's report was derived from the analysis in the First Murphy Report, the district court held that it suffered from the same fundamental unreliability. JA-1068.

**3.** After concluding that the Second Murphy Report was wholly unreliable, the district court held that the Third Murphy Report did not cure the earlier report's defects and was equally unreliable. The district court found that Murphy did not make the corrections he claimed to make and even introduced new errors. JA-1065. Specifically, Murphy did not correct the coding errors for race, gender, and pass/fail status, contrary to his claim. JA-1065. Murphy also did not construct his new analysis to account for the relevant time periods, again contrary to his claim. Instead he "added only a handful of new applicants to his database in a laughable attempt to better capture the relevant time period." JA-1065. Critically, despite not adding *other* applicants from the later time periods, Murphy kept in his original cherry-picked set of fails, even though he claimed that he removed them. JA-1065. "Amazingly, despite his claims of doing so," Murphy did not remove the data regarding applicants rejected under the old, more stringent credit history criteria. JA-1065. Finally, Murphy introduced new double counting. "Suspiciously, 11 of these double-counts are 'fails' while only 2 of them are 'passes.'" JA-1065.

13

Because, "whether intentional or not," Murphy's Third Report continued his "pattern of producing a skewed database" filled with cherry-picked and double-counted fails, JA-1065, the district court concluded his analysis was not reliable.

**4.** In the alternative, the district court held that the Third Murphy Report, which was filed six months after the EEOC's expert disclosure deadline, should be excluded as untimely.  The district court held that the Third Murphy Report did not qualify as a supplement and the untimely filing was not "substantially justified or harmless."  JA-1067-JA-1068.

**5.**    After granting Freeman's motion to exclude Murphy and Huebner's testimony, the district court rejected the EEOC's argument that general population statistics alone could satisfy its burden to prove disparate impact.  The court held there was no indication that the general population was representative of the relevant applicant pool.  JA-1069.  Moreover, none of the general statistics measured Freeman's actual hiring criteria.  JA-1069.  Furthermore, the EEOC's reports disproved the relevance of the general statistics because the reports found no disparate impact on Hispanics from the applicant data despite disparity between Whites and Hispanics in the general statistics.  JA-1069.

**6.** Finally, the district court held that the EEOC had not satisfied its burden to identify the specific employment practice that caused the alleged disparate

impact.  JA-1070-JA-1072.  The district court did not reach other grounds raised by Freeman for summary judgment.

**7.** The district court denied the EEOC leave to file a sur-reply.  JA-1072-JA-1076.

## SUMMARY OF ARGUMENT

Like any plaintiff in any case, the EEOC's burden to withstand summary judgment required it to produce sufficient reliable evidence of disparate impact from which a reasonable factfinder could conclude it had proved its case.  The district court did not err in holding the EEOC failed to meet that burden.  First, the district court properly exercised its discretion to exclude expert testimony when the expert's methods included cherry-picking data to produce a skewed result and willful, unexplained blindness toward available and correct data.  Such gerrymandering of the data transgresses longstanding principles of statistical reliability in Title VII cases.  Rule 702 does not require a district court to close its eyes to "an egregious example of scientific dishonesty."  JA-1063.  And Freeman is not required to disprove disparate impact—an essential element of the *EEOC's* case—in order to show that the EEOC's evidence does not establish a *prima facie* case.

The EEOC's applicant flow analysis (based on manipulated, irrelevant, incomplete and inaccurate data), and its general population statistics (which are not

15

tailored to Freeman's jobs, market, or hiring criteria) are of negligible probative value. Neither can carry the EEOC's burden. Nor did the district court abuse its discretion in holding the EEOC to the court's scheduling order. The district court operated well within its discretion when excluding as untimely the EEOC's third try at a reliable expert report, and the EEOC's fourth for failure to establish the need for a sur-reply (which the EEOC does not even challenge on appeal).

Because the EEOC's evidence falls far short of the summary judgment standard, this Court need not reach the EEOC's legal issues of first impression. The district court correctly held, however, that the EEOC failed to isolate and identify a particular employment practice as required by Title VII. The EEOC protests that it identified singular policies, but each is composed of distinct and independently significant criteria. The statute does not permit the EEOC to aggregate multiple hiring criteria into one analysis if they are capable of separation, and the EEOC has never contended that Freeman's criminal and credit history criteria are incapable of separation.

The district court also properly limited the scope of the EEOC's claims to the charge-filing period. The plain text of Section 707 requires the EEOC to follow Section 706 procedures. The EEOC offers no basis for departing from that text and eliminating any limitations period. Moreover, with respect to the criminal history claims, the district court straightforwardly applied this Court's precedent

16

holding that when the EEOC expands an investigation beyond the claims made in the charge, recovery is limited based on the timing of the notice to the employer.

## ARGUMENT

## I.      STANDARD OF REVIEW

This Court reviews the district court's exclusion of an expert witness for an abuse of discretion, *Carr v. Deeds*, 453 F.3d 593, 601 (4th Cir. 2006), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010), and will reverse only if left with "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 161 (4th Cir. 2012).

The district court's orders granting Freeman's partial motion to dismiss and its motions for summary judgment are subject to *de novo* review. *See Dooley v. Hartford Acc. & Indem. Co.,* 716 F.3d 131, 135 (4th Cir. 2013); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 776 (4th Cir. 2013). However, "a complete failure of proof concerning an essential element of the plaintiff's case necessitates a grant of summary judgment in favor of the defendant." *Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 200 (4th Cir. 2013) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## II.  THE EEOC DID NOT PRODUCE RELIABLE EVIDENCE THAT COULD ESTABLISH DISPARATE IMPACT.

"To establish a prima facie case of disparate impact discrimination under Title VII," the EEOC "must show that the facially neutral employment practice had a significantly discriminatory impact." *Anderson*, 406 F.3d at 265.  Accordingly, as the EEOC acknowledges, it must "'prove discrimination by a preponderance of the evidence.'"  EEOC Br. 27 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part)).  This showing has two steps: The EEOC "must first begin by identifying the specific employment practice that is challenged."  *Watson*, 487 U.S. at 994 (plurality).  It must then "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs … because of their membership in a protected group."  *Id*.

To survive summary judgment, this evidence must be sufficiently reliable and probative that it "could … lead a rational trier of fact to find" for the EEOC. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Only "significantly probative" evidence that is more than "merely colorable" meets the standard.  *Thompson Everett, Inc. v. Nat'l Cable Adv.*, *L.P.,* 57 F.3d 1317, 1323 (4th Cir. 1995).  Assertions that are "blatantly contradicted by the record" will not do.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

18

The district court concluded that the EEOC's statistical evidence was "completely unreliable, and insufficient to support a finding of disparate impact." JA-1059. Because this holding was correct under well-established principles governing statistical reliability and expert evidence, this Court may affirm the district court's judgment without reaching the legal questions of first impression raised by the EEOC.

## A. The District Court Properly Exercised Its Discretion To Exclude The EEOC's Expert Evidence.

The district court found the EEOC's statistical evidence so unreliable that it was inadmissible under Rule 702. Rule 702 charges the district court with the gate-keeping function of ensuring that expert testimony is admitted only if it "is based on sufficient facts or data," it "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The "inquiry envisioned by Rule 702 is … a flexible one," but the district court is "assign[ed] … the task of ensuring that an expert's testimony … rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594, 597 (1993). The EEOC does not dispute that summary judgment was properly granted if the expert evidence is excluded. *See* EEOC Br. 57 (contending only that the EEOC's general population statistics would "buttress[]" its *prima facie* case). That concession decides this case, because the

19

district court was well within its discretion to exclude the EEOC's expert testimony.

### 1. *The Expert Evidence Fails Well-Established Principles of Statistical Reliability.*

Merely "offer[ing] statistical proof does not mean" the EEOC is "automatically entitled to a presumption that [it has] proved a *prima facie* case, without any scrutiny of [its] proffered statistics." *Allen v. Prince George's Cnty., Md.*, 737 F.2d 1299, 1304 (4th Cir. 1984); *Watson*, 487 U.S. at 996 (plurality) ("Nor are courts or defendants obliged to assume that plaintiffs' statistical evidence is reliable."). The district court's scrutiny of the EEOC's statistical evidence was consistent with well-established principles.

*First*, the district court properly heeded this Court's instruction "to guard against the use of statistical data which may have been segmented and particularized and fashioned to obtain a desired result." *EEOC v. Fed. Reserve Bank of Richmond*, 698 F.2d 633, 646 (4th Cir. 1983), *vacated on other grounds sub nom. Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984). The EEOC's evidence was based on precisely such "gerrymandered data." *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1443-46 (2d Cir. 1995) (rejecting reliance on arbitrarily limited and miscoded statistics). The Second Murphy Report "cherry-picked certain individuals from the other discovery materials in an attempt to pump up the number of 'fails' in [Murphy's] database," JA-1063, and double counted

20

additional fails, JA-1064.  The Third Murphy Report did not correct that problem, and compounded it by introducing more double-counted fails.  JA-1065.  In an analysis where the number of fails is quite low, adding double-digit cherry-picked and double-counted fails is material.  JA-1065.

The EEOC's description of the problem as the exclusion of "most" applicants after October 2008, EEOC Br. 53, 56, thus misses the mark.  The gravamen of the district court's concern was not only the simple exclusion of all but a "laughable" handful of post-October 2008 applicants.  JA-1065.  It was foremost Murphy's "continued pattern of producing a skewed database" by cherry picking and double counting.  JA-1065.  The district court permissibly discounted this "egregious example of scientific dishonesty."  JA-1063.

*Second*, the district court properly recognized that the EEOC's statistical analysis was based in part on an obsolete, more stringent credit policy.  JA-1063-JA-1064; JA-1065 ("[D]espite his claims of doing so," Murphy did not exclude data from obsolete policy in his Third Report).  The "essential requirement is that the data concern those persons subject to the challenged employment practice." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006) (rejecting statistics based on an employee pool not necessarily subject to the challenged practice).  The EEOC contends the changes to the credit policy were minor.  EEOC Br. 57.  But

Freeman identified examples of applicants whose results would have been different depending on which policy applied. JA-457.

*Third*, the district court properly rejected the EEOC's decision to ignore available, correct, and relevant data and instead rest its analysis on irrelevant and inaccurate data. Specifically, Murphy constructed a database based primarily on data from before the limitations period, and from fewer than half of Freeman's 39 branches for the criminal history database. JA-1061-JA-1062; JA-1064. Courts have repeatedly rejected the aggregation of data straddling a liability period. *See Fed. Reserve Bank*, 698 F.2d at 663 (aggregate data from 1967-1978 insufficient because "the crucial years in this case are 1974 to 1978 and it is for those years that we must look for discrimination or not at all"); *Smith v. Western Elec. Co.*, 770 F.2d 520, 526 (5th Cir. 1985) (inclusion of pre-class-period data raised "serious questions about the validity" of expert's conclusion). Courts have likewise rejected the arbitrary exclusion of relevant data. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) ("It is an unacceptable statistical procedure to turn a large sample into a small one by arbitrarily excluding observations."). The Second Murphy Report fails in both directions. The Third Murphy Report did not fix the problem, making only a "laughable attempt to better capture the relevant time period." JA-1065.

The EEOC responds that evidence of pre-limitations data is appropriate, and that inclusion of all observations is not necessary for reliability. EEOC Br. 53-55. But courts should not ignore unexplained omissions of known, relevant data. *See Payne v. Travenol Labs.*, 673 F.2d 798, 823 (5th Cir. 1982) (expert evidence "exclud[ing] one-fourth of all applications for the time it covered" without any testimony "that the missing applications were removed randomly" "detract[s] significantly from the value of the … showing"). Thousands of background checks were inexplicably missing from Murphy's analysis, JA-1294-JA-1295, which did not purport to randomly sample a fuller data set, but rather purported to analyze every applicant for whom the background check results and demographic data were known, JA-325.[1] Because Murphy removed all of the background check dates, it was only through "painstaking comparison" that Freeman could prove that Murphy had, in fact—with no acknowledgement or explanation—omitted the vast majority of relevant observations. JA-1061 n.6. Moreover, the arbitrarily excluded data was different from what Murphy chose to include—beyond even the cherry-picking of "fail" observations. For example, the white fail rate under the criminal history criteria at Mohave Valley was at least 7.4%, JA-966, JA-969, more than four times the overall white fail rate and exceeding the 6% black fail

---

[1] Freeman did not argue, and the district court did not find, that Murphy had access to some 58,000 background checks. *See* EEOC Br. 52. Rather, the district court simply acknowledged Murphy's own statement that his "final consolidated date [sic] file included information on 58,892 applicants." JA-325; *see* JA-1061.

23

rate reported in the Third Murphy Report, JA-802. Mohave Valley requested 6% of the criminal background checks but represents less than .4% of Murphy's data in the Third Murphy Report. JA-967.

Thus, it is not only that Murphy merely added some pre-limitations data to an otherwise complete data set. Rather, he favored pre-limitations data to the *exclusion* of over a thousand within-limitations observations. The out-of-circuit cases on which the EEOC relies are thus inapt, because they are informed by a concern that failure to allow pre-limitations data might result in sample sizes too small for analysis. *See Paige v. California*, 291 F.3d 1141, 1149 (9th Cir. 2002) (citing rule allowing supplementation when the data set would otherwise be too small); *McReynolds v. Sodexho Marriott Servs.*, *Inc.*, 349 F. Supp. 2d 30, 43 (D.D.C. 2004) (citing support noting that aggregated data are more probative than data broken into subgroups).[2]

*Finally*, the scant relevant data included in the reports did not reflect reality with respect to race, gender, and pass/fail status. JA-1064-JA-1065; *see Fisher*, 70 F.3d at 1444 (reversing judgment to plaintiff on disparate treatment claim where plaintiff's statistics "contain[ed] numerous errors in the categorization of the marital status of … various professors" and plaintiff demonstrated "unwillingness

---

[2] Thus, even if this Court were to agree that the EEOC may bring claims without any time bar, *see* EEOC Br. 54, it would not solve Murphy's inexplicable refusal to include data from the latter part of the liability period except for the "fail" additions.

24

to consult reliable sources of data").  The EEOC contends that it would have been improper for Murphy to single out EEOC claimants for inclusion.  EEOC Br. 55-56.  Freeman never suggested that it should.  Rather, Freeman pointed to the EEOC claimants simply for the purpose of using a known group of applicants to test the reliability of the data set Murphy constructed, and to show how unreliable it was— with 29 of 41 claimants having missing or wrong data in Murphy's analysis, JA-1277.

Although the EEOC may be "free to attempt to utilize an alternative benchmark in order to form [its] calculations" when the "employer destroys relevant employment data," it is not free to ignore the accurate data produced by an employer in favor of artificially constructed data sets that "will not be as good." *Brown v. Nucor Corp.*, 576 F.3d 149, 155 & n.6 (4th Cir. 2009).

### 2.    *The District Court Properly Exercised Its Rule 702 Gatekeeping Function.*

The district court's scrutiny of Murphy's statistical testimony properly considered whether Murphy's opinion rested on an adequate foundation and represented the reliable application of statistical methods.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 144-145 (1997) (district court did not abuse its discretion in examining whether expert's opinion was sufficiently supported by the data on which it purported to rely).

25

**a.**  The EEOC's primary argument is not that the series of successive Murphy Reports were reliable, but that they were not unreliable in a way that would make them inadmissible.  In the EEOC's view, Rule 702 excludes only unreliable methods, not opinions based on an unreliable foundation.  *See* EEOC Br. 47-48.  The EEOC's cramped view of Rule 702 would preclude the district court from excluding evidence even when, as here, the district court found that the expert deliberately manipulated data and engaged in "egregious" "scientific dishonesty." JA-1063.  The district court's proper role in assessing the reliability of expert evidence is not so limited.

The Supreme Court has made clear that the "factual basis" of an expert's opinion, including its "data," is as relevant to the district court's gatekeeping function under Rule 702 as the expert's "methods."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) ("[W]here [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, … the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'") (quoting *Daubert*, 509 U.S. at 592) (last alteration in original).  It was thus entirely proper for the district court to consider whether Murphy's opinion rested on an adequate foundation.  *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002) (upholding exclusion of expert testimony because, *inter alia*, the expert

26

"used unreliable data"); *Muñoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) ("If the basis for an expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact.").

In any event, the district court's exclusion order is more properly understood as a rejection of Murphy's methodology. Here, the actual data is undisputed—that is, the parties are not contesting what set of data better represents reality. The dispute is whether Murphy used reliable methods when he created his own data set from those undisputed records. The Eleventh Circuit has explained this distinction, rejecting the argument that "the district court improperly took issue with [the expert's] data, and not his methodology" where the district court criticized the expert's creation of a data set because, for example, the expert simply assumed temperature records from one site would apply to another and continued to rely on unreliable records. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292-93 (11th Cir. 2005).

The EEOC primarily relies upon *TFWS, Inc. v. Schaefer*, 325 F.3d 234 (4th Cir. 2003), for the proposition that a "true *Daubert* challenge" must consist of attacks along the lines of the factors identified in *Daubert*. *See id.* at 240. But *TFWS* simply emphasized the "great deference" this Court gives "to a district court's decision to admit or exclude expert testimony under *Daubert*," and

27

affirmed the district court's rejection of a simple challenge to the expert's calculations, with no challenge to his methods (or, apparently, his data). *Id.* Other cases cited by the EEOC acknowledge that it is proper for a district court to consider whether the expert's opinion is "supported by appropriate validation— *i.e.*, good grounds, based on what is known," but simply find no such error properly asserted. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008); *McReynolds*, 349 F. Supp. 2d at 39 (rejecting claim of data manipulation where "most purported mistakes were not errors to begin with"). Nor do any of the other cases involve findings that an expert manipulated *undisputed* records in a way that produced an unreliable data set—manifestly not a reliable scientific method. *See, e.g.*, *Burns v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004) (affirming admission of expert testimony despite expert's use of underlying sales data that other party disputed); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1344-45 (11th Cir. 2003) (same for aerodynamic data).

**b.** Next, the EEOC insists that an employer cannot establish that the EEOC's statistical evidence is unreliable unless it introduces its own statistical evidence that disproves disparate impact. *See* EEOC Br. 50-52. This upends Title VII's carefully articulated burden shifting analysis. The EEOC's *prima facie* case requires sufficient evidence from which a factfinder could find disparate impact. *See Garcia*, 998 F.2d at 1486 (to make out *prima facie* case the EEOC "must do

28

more than merely raise an inference of discrimination," it "must actually prove the discriminatory impact at issue"); *Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1509 (10th Cir. 1987) (same); *Maddox v. Claytor*, 764 F.2d 1539, 1553 (11th Cir. 1985) (same). The only burden that shifts to the employer is the burden to prove job-relatedness. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i). An employer may show through a variety of means that the EEOC has not introduced "statistical evidence of a kind and degree sufficient" to prove disparate impact, *Watson*, 487 U.S. at 994 (plurality), and thereby has not made a *prima facie* case. *Id.* at 996 (employer "may endeavor to impeach the reliability of the statistical evidence," "offer rebutting evidence," or "disparage in arguments … the probative weight which the plaintiffs' evidence should be accorded"); *Fed. Reserve Bank*, 698 F.2d at 646 (same); *see also In re Employment Discrimination Litig.*, 198 F.3d 1305, 1313 (11th Cir. 1999); *Payne*, 673 F.2d at 817; *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 313 (7th Cir. 1988) (rejecting the EEOC's argument that employer "had the burden of responding with a more probative *statistical* analysis" or "more refined, accurate and valid statistical evidence").

The EEOC attempts to distinguish *Sears* on the grounds that it was a disparate treatment case. EEOC Br. 51-52. To the extent the type of claim makes any difference, however, the EEOC's *prima facie* burden is heavier, not lighter, in

a disparate impact case. *See Garcia*, 998 F.2d at 1486; *Thomas*, 814 F.2d at 1509; *Maddox*, 764 F.2d at 1553.

Freeman did, consistent with *Watson* and this Circuit's law, "impeach the reliability of the statistical evidence" and fatally undermine the "probative weight" that evidence should be accorded. *See* pp. 20-25, *supra.* The EEOC nevertheless insists that once it "established a colorable prima facie case … Freeman needed to show that correcting the errors would negate the disparate impact." EEOC Br. 50. But the EEOC's *prima facie* burden at the summary judgment stage is to produce sufficient, reliable evidence of disparate impact that is more than "merely colorable." *Thompson Everett*, 57 F.3d at 1323. Freeman showed that the EEOC's evidence was discredited by the record. The EEOC's claim that Freeman then also had to *disprove* the EEOC's case to merit summary judgment would alter basic principles of summary judgment. *See Celotex Corp.*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.").

There simply is no requirement that an employer introduce a rebuttal expert report to negate disparate impact in order to demonstrate that the EEOC has not met its *prima facie* burden. *See Carpenter*, 456 F.3d at 1201-03 (upholding summary judgment for employer where plaintiffs' evidence did not reliably measure disparate impact, even though plaintiffs argued that the disparities were

30

"so large that a substantial disparity would certainly be present even if the statistical analysis were adjusted" and the defendant's evidence did not "disprove[] Plaintiffs' allegations of disparate impact"). The cases relied upon by the EEOC do not stand for its proposition. *Anderson v. Group Hospitalizations*, *Inc.*, 820 F.2d 465, 471 (D.C. Cir. 1987), stands only for the unremarkable proposition that a party cannot complain that "evidence was admitted without … mathematical safeguards" when it successfully objected to testimony regarding such safeguards.

The other cases hold that when the plaintiff has established disparate impact based on "an array of well-crafted and highly significant statistics," the defendant cannot impeach statistical reliability by simply raising a hypothetical factor that might have made a difference, "without support." *See EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 119-20 (2d Cir. 1999). Thus, an employer may not simply point to some external factor not accounted for and assert it would make a difference, unless its relevance is obvious. *See Carpenter*, 456 F.3d at 1201; *EEOC v. Gen. Tel. Co. of NW*, *Inc.*, 885 F.2d 575, 582-83 (9th Cir. 1989) (not enough to assert a failure to account for gender-based differences in career interests); *Capaci v. Katz & Besthoff*, *Inc.*, 711 F.2d 647, 653-654 (5th Cir. 1983) (no demonstrated need to limit applicant pool by additional factors). Freeman's impeachment of the EEOC's evidence is entirely different. Freeman did not simply point to some external factor the EEOC had failed to analyze, but proved

31

that the EEOC's analysis failed on its own terms because it did not reflect the actual applicant flow at Freeman, as the analysis purported to do.

The EEOC's contention boils down to this: so long as it introduces a table that recites statistically significant numbers, then the EEOC withstands summary judgment unless the employer disproves disparate impact. That is not the law. It is a fundamental principle of summary judgment—as applicable to the EEOC as to any plaintiff—that the defendant may win simply by showing that the plaintiff has failed to make its case. *Celotex Corp.*, 477 U.S. at 323.

**c.** Finally, the EEOC's contention that the Third Murphy Report contained no "sufficiently serious" flaws falls flat. The standard may not be "perfection" (EEOC Br. 49), but it surely rules out expert evidence that is "cherry-picked" and "skewed," JA-1065. The EEOC recites a litany of assertions by Murphy as to how his third report cured the problems identified by Freeman. *See* EEOC Br. 52-57. However, it nowhere explains how the district court erred in finding that what Murphy *said* is not what he *did*. A district court need not take an expert's assertion at face value. *Maddox*, 764 F.2d at 1554 (upholding district court's finding that plaintiff's expert improperly aggregated data despite expert's declaration that he did not aggregate). Here, the district court found—and the EEOC does not contest—that Murphy's assertions were squarely contradicted by the record, for example:

32

- "Murphy denied" relying on the investigation spreadsheets, EEOC Br. 52 n.7, but that is what he did, JA-1061; *see* JA-958 ¶ 6.

- Murphy stated his exclusion of "most post-10/08 applicants … resulted from the state of Freeman's files and his 'conservative approach,'" EEOC Br. 53, but Freeman provided Murphy all the necessary data, JA-1060; *see* JA-273-JA-274.

- "Murphy disputed he made all the errors ascribed to him," EEOC Br. 56, but the errors were almost exclusively Murphy's, JA-1065 n.7; *see* JA-959-JA-960.

- "Murphy stated" that applicants who were listed twice were not necessarily counted twice, EEOC Br. 56-57, but Freeman demonstrated they were counted twice, JA-1065; *see, e.g.*, JA-960 ¶ 10.

The EEOC asserts repeatedly that Freeman did not show that any of these flaws mattered. *See* EEOC Br. 53, 55, 57. Not so. Freeman did not introduce its own statistical analysis, but it did show that Murphy's double-counting, selective additions, and miscoding materially skewed the results. In the context of an analysis where the numbers of fails attributed to the purportedly disadvantaged group is small, the district court did not abuse its discretion in concluding that the invention of double-digit extra fails through double-counting and cherry-picking represented a pattern of skewing results in a way that rendered Murphy's analysis unreliable. *See* JA-1063, JA-1065.

33

**B. No Reasonable Jury Could Find Disparate Impact From The EEOC's Statistical Evidence, Including The General Population Statistics.**

The fundamental unreliability that led the district court to exclude Murphy's testimony equally demonstrates that the EEOC's purported applicant flow analysis fell far short of what is required to withstand summary judgment. And the EEOC's general population statistics add nothing meaningful to its *prima facie* case. The district court correctly held the general statistics were of negligible probative value, for three reasons. JA-1068.

*First*, the EEOC made no attempt to tailor its general population statistics to the qualified applicant pool for each of Freeman's branches or job groupings. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(k) (requiring "a comparison[ ] between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs"). A plaintiff's "statistical evidence [is] inadequate to create a genuine issue of material fact" where it fails "to show that [its] statistical 'applicant pools' contained only individuals who were at least minimally qualified." *Bennett v. Nucor Corp.*, 656 F.3d 802, 817-18 (8th Cir. 2011). Here, the EEOC has not even attempted to isolate an applicant pool, but considered every member of the national population to be a qualified applicant for every job at Freeman.

34

The EEOC responds that general population statistics are probative where the application process likely deterred applicants, and there is no reason to suppose a mismatch between the national population and the qualified labor pool. EEOC Br. 58-60. Freeman pointed, however, to differential rates in criminal background fails in different branches. *See* JA-966, JA-969. And it is manifest as a matter of law, *EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 185 (4th Cir. 1979), that Freeman's qualified applicant pool would not include everyone in the nation, "even if none of the arguably 'deterring' practices existed," *see Wards Cove*, 490 U.S. at 654 (labor pool of company employees "cannot be used as a surrogate for the class of qualified job applicants because it contains many persons who have not (and would not) be … job applicants"). Moreover, the policy on its face identified special qualifications for at least some jobs, *e.g.* those requiring verified educational credentials. *See* JA-104; JA-378-JA-381. The EEOC made no attempt to address these factors.

The EEOC's reliance on *Dothard v. Rawlinson*, 433 U.S. 321 (1977), is misplaced. In dealing with a characteristic like height and weight, there is no reason to suppose a difference between the general population and the qualified labor force. *Id.* at 330. In contrast, there are manifest reasons to suppose that individuals with criminal justice involvement also share other characteristics that would disqualify them from employment at higher rates than for the general public.

35

*Cf. New York City Transit Authority v. Beazer*, 440 U.S. 568, 586 (1979) (rejecting use of statistics showing racial division in methadone programs when "a substantial portion of the persons included in it are … unqualified for other reasons—such as the illicit use of drugs and alcohol").

*Second*, the proffered general population statistics did not even reflect Freeman's actual background check criteria. The EEOC's statistics covered arrest rates, JA-387, state court arraignments, JA-390, incarceration, JA-392, and credit scores, JA-339. Not one of those factors was considered by Freeman. General population statistics must address the policy being challenged. *See N.Y. City Transit Auth.*, 440 U.S. at 585-86 (rejecting district court's reliance on statistics relating to methadone participation generally when the policy at issue addressed participation for one year or more). The district court properly declined to hold that such an attenuated showing satisfied the EEOC's *prima facie* burden.

The EEOC relies on the Second Huebner Report to assert that no data is available that examines employment qualifications and criminal justice involvement, and that it has provided data on felony convictions. EEOC Br. 60-61.[3] As discussed below, that report was never made part of the summary judgment record, and the EEOC has not challenged the district court's decision denying leave to file it. *See* pp. 44-45, *infra*. In any event, where, as here, the

_____

[3] The EEOC has not provided data regarding relevant credit criteria, nor claimed its unavailability.

36

population statistics are so far off the mark, the EEOC cannot win by simply asserting there is no other, relevant evidence from which it could build a probative case.

*Third*, the EEOC's general statistics would have indicated that Freeman's criminal history criteria had a disparate impact on Hispanics. *See* JA-339, JA-387, JA-392. Murphy's applicant flow analysis demonstrated otherwise. JA-1069. The EEOC has no answer to the district court's reasoning on this point.

In sum, the EEOC's drumbeat that the various flaws in Murphy's analysis are not proper subjects of a *Daubert* challenge, EEOC Br. 53, 56, is wrong but also insufficient. Even if this Court were to conclude that the EEOC's expert testimony was not so unreliable as to be inadmissible, it could still affirm on the ground that the EEOC's faulty statistical evidence is simply not sufficiently probative to sustain the EEOC's burden at summary judgment. The general population statistics add nothing valuable. Thus, the district court did not err in holding that the EEOC failed to meet its summary judgment burden.

### C. The District Court Properly Exercised Its Wide Latitude To Control The Timing Of Expert Discovery.

#### 1. *The District Court Properly Exercised Its Discretion to Exclude the Third Murphy Report as Untimely.*

In the alternative to excluding the Third Murphy Report under Rule 702, the district court excluded it as untimely. JA-1066-JA-1068. Under the governing

37

scheduling order, the EEOC's expert disclosures were due on July 18, 2012.  JA-257.  The EEOC produced the Third Murphy Report on January 22, 2013.  JA-1066.  The district court did not abuse its discretion in refusing to approve the EEOC's six-months-late attempt to substitute a new expert report.

**a.**  The Third Murphy Report was not a supplemental report.  A party must supplement its expert disclosure when it "learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  The district court properly rejected the EEOC's attempt to shoehorn the Third Murphy Report into the duty to supplement.

Rule 26(e) supplementation does not "apply whenever a party wants to bolster or submit additional expert opinions" because that would "[wreak] havoc in docket control and amount to unlimited expert preparation."  *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012) (alteration in original); *see Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009) (affirming exclusion of untimely expert declaration that did not "correct an inaccuracy in the Plaintiffs' original disclosures, nor did it fill in a gap based on information previously unavailable").

The Third Murphy Report does not, on its face, "supplement or correct [the] disclosure" on the ground that the EEOC "learn[ed] that in some material respect the disclosure … is incomplete or incorrect," Fed. R. Civ. P. 26(e)(1).  Rather, its

primary opinion is that the Second Murphy Report is *not* materially incomplete or incorrect.  *See, e.g.*, JA-788-JA-789 ("It is my understanding that my analysis … has been criticized ….  I disagree[.]"); JA-796.  Because the EEOC is not "conceding that the [Second Murphy Report] is inaccurate or incomplete, then the [third] disclosure is not a proper supplemental disclosure."  *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998).  Thus, the report does not *augment* the initial analysis; rather it insists no augmentation is necessary and then supplies an entirely new set of tables—based on information the EEOC had prior to its initial disclosure—to wholly replace the Second Murphy Report.  JA-1054 (EEOC argued Third Murphy Report "moot[ed]" critiques of Second Murphy Report).

The EEOC insists that the Third Murphy Report was a proper supplement because Murphy did not change his bottom line opinion, but simply refined his data.  That is flat wrong.  Murphy did not simply refine his data; he performed a new analysis on an entirely new basis—a purportedly broader data set.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (initial expert disclosure must contain "a complete statement of … the basis and reasons for" the expert's opinions).  The cases relied upon by the EEOC, EEOC Br. 40, simply reflect that district courts take different approaches in varying factual contexts, exercising their latitude to maintain control of the litigation.  *See Tucker v. Ohtsu Tire & Rubber Co.*, 49 F. Supp. 2d 456, 459-61 (D. Md. 1999) (allowing supplementation based on single new test that was

39

"technically timely" where defendant did not contest that report was a proper supplement); *Nnadili v. Chevron U.S.A., Inc.*, Nos. 02-1620(ESH)(AK), 03-1593(ESH)(AK), 2005 WL 6271043, *2 (D.D.C. Aug. 11, 2005) (allowing supplementation regarding survey where initial disclosure stated that expert would undertake that survey); *IP Innovation L.L.C. v. Red Hat, Inc.*, No. 2:07-cv-447(RRR), 2010 WL 1027479, *1 (E.D. Tex. Mar. 11, 2010) (allowing supplemental report that was a "good faith effort to comply with the court's order"). An expert does not have to change his bottom-line opinion for an untimely disclosure to represent a "dramatic, pointed variation." *Keener*, 181 F.R.D. at 641 (rejecting purported supplement because it "sets out extensive responses to each of the expert opinions that the plaintiff disclosed"); *Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) (rejecting supplement that "address[ed] the numerous problems in the expert report that plaintiffs discussed in moving for summary judgment").

This Court has expressly recognized the "broad discretion" afforded the district court in this area. *Campbell*, 470 F. App'x at 156. The EEOC insists that *Campbell* is irrelevant because there the plaintiff did not provide an adequate initial disclosure. That is a distinction without a difference. In both cases, the purported supplement "did not simply add or correct information, but rather attempted to recast [the expert's] initial opinions so as to comply with the

requirements" of a federal rule—there Rule 26, and here Rule 702. *See Campbell*, 470 F. App'x at 157. Either way, it is not proper Rule 26(e) supplementation.

**b.** The EEOC did not establish an exception to exclusion under Rule 37(c)(1). That rule makes exclusion an "automatic sanction"; the "general rule excluding evidence" applies unless two narrow exceptions are met: the untimely disclosure is "substantially justified" or "harmless." *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003). The district court considered and rejected both exceptions. JA-1067-JA-1068. Thus, the EEOC's contention (EEOC Br. 42) that the district court applied the wrong standard fails. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011) (finding no abuse of discretion where district court did not "expressly mention the five-factor test" under *Southern States*). The conclusion that the EEOC had established neither exception falls well within the "wide latitude" afforded the district court. *Southern States*, 318 F.3d at 595.

*First*, the EEOC has pointed to *no* justification for the untimely disclosure. The EEOC's insistence that its failure to timely disclose is justified because *Freeman* had not yet deposed Murphy or disclosed its own experts, EEOC Br. 44, makes no sense. The EEOC's obligation to timely produce its own reliable expert analysis in no way turns on whether Freeman designates an expert or deposes Murphy—which it is under no obligation to do. As the EEOC does not dispute,

41

Freeman produced all of the information necessary for a reliable analysis prior to the EEOC's initial disclosure deadline. JA-1067. This case is thus entirely different from one in which the expert's initial disclosure indicated he would conduct additional analysis once particular information, then unavailable, was received. *See Dunning v. Bush*, 536 F.3d 879, 889 (8th Cir. 2008) (rejecting exclusion of testimony where initial disclosure "noted … that a precise value … would be determined when more information was available"). The gravamen of the EEOC's argument is the claim that the rules preclude Freeman from moving to exclude the EEOC's expert unless Freeman has pointed out the flaws in the EEOC's analysis through its own expert and allowed the EEOC an opportunity to cure. The Federal Rules of Civil Procedure impose no such obligation on the defendant or safe harbor for the EEOC.

*Second*, Freeman was prejudiced by the untimely disclosure. *See Southern States*, 318 F.3d at 596. The EEOC insists that Freeman could have taken Murphy's deposition, and the untimely disclosure was not disruptive because no trial date had been set. EEOC Br. 43-44. That ignores the context of this untimely disclosure, dropped in the middle of pending *Daubert* and summary judgment proceedings. Although many of the cases cited by the EEOC address disruptiveness with respect to trial, Rule 37(c)(1) is not so limited. It expressly addresses exclusion "on a motion, at a hearing, or at a trial." Fed. R. Civ. P.

42

37(c)(1). Indeed, the EEOC's own authority recognizes that disruption is not measured solely by a trial setting. *See In re New Bern Riverfront Dev., LLC*, No. 09-0340-8-SWH, 2013 WL 4834016, *6 (Bankr. E.D.N.C. Sept. 10, 2013) (finding no disruption where "no dispositive motions are currently pending").

*Third*, the Third Murphy Report is not particularly important to the EEOC's case. The EEOC already "has a report in the record" that it claims is perfectly reliable. *Gallagher*, 568 F. Supp. 2d at 632 (finding new expert report "not particularly important" when there is already a report in the record). Unlike *Mayor & City Council of Baltimore v. Unisys Corp.*, No. JKB-12-cv-614, 2013 WL 4784118, *4 (D. Md. Sept. 5, 2013), the EEOC would not be deprived of its expert altogether because the Third Murphy Report was excluded as untimely. It is simply deprived of a replacement report for the two it already submitted.

The exclusion of the Third Murphy Report does not establish a get-it-perfect-the-first-time-or-go-home rule. *See* EEOC Br. 38. First, the EEOC had two opportunities to get it right, following "numerous extensions," JA-1054, before it submitted the Third Murphy Report. Second, the district court fully considered the Third Murphy Report in its analysis of reliability and excluded it as untimely only in the alternative, so the EEOC actually had three tries to get it right. JA-1065-JA-1066. Moreover, the EEOC had all of the necessary data to conduct a reliable analysis before the discovery deadline, JA-1060, and did nothing to

43

review, refine, or correct its own analysis either before the deadline or in the months thereafter—until dispositive motions were pending.  Neither the letter nor the spirit of Rules 26 and 37 preclude the district court from rejecting the EEOC's last-minute Mulligan.

### 2.  *The Fourth Murphy Report Was Never Before the District Court Because of the District Court's Unchallenged Denial of the EEOC's Request to File a Sur-Reply.*

The EEOC contends that even if the district court properly determined that the first three Murphy Reports were unreliable, the district court nonetheless erred in barring Murphy's testimony altogether because the Fourth Murphy Report purportedly corrected every asserted error.  EEOC Br. 49.  Yet the EEOC ignores the reason the district court "never even considered the reliability of" the Fourth Murphy Report, EEOC Br. 49:  The report was never made part of the summary judgment record.

After the close of briefing, the EEOC filed a motion for leave to file a sur-reply to the motion to exclude.  JA-1072.  The EEOC did not attach a proposed sur-reply brief or exhibits.  JA-1075.  The EEOC first brought the Fourth Murphy Report and Second Huebner Report to the district court's attention at the hearing on Freeman's motions for summary judgment and to exclude, proffering them because they "were going to be attached to the sur-reply."  JA-1147.  The district court rejected the EEOC's sur-reply, reasoning that none of the arguments in

44

Freeman's reply brief were new.  Rather, "the vast majority of them are the same ones [Freeman] identified as to the original report" and the EEOC "did not lack a chance to respond" but "simply squandered its chance."  JA-1073-JA-1074.  The district court also noted that a sur-reply would "fly in the face of the Court's scheduling order" by allowing the EEOC "to move the target yet again and get a second (or third or fourth) bite at the apple."  JA-1076.

The district court's decision to deny a sur-reply would be reviewed for abuse of discretion, *FDIC v. Cashion*, 720 F.3d 169, 173-74 (4th Cir. 2013), but the EEOC has not challenged it, *see Carter v. Lee*, 283 F.3d 240, 252 (4th Cir. 2002) ("[C]ontentions not raised in an opening brief [are] waived.").  The Fourth Murphy Report and Second Huebner Report are not part of the summary judgment record, and the EEOC has not challenged on appeal the decision by which they were excluded.

### 3.    *The Fourth Murphy Report Is Properly Excluded as Untimely.*

Even if the EEOC were correct that the district court excluded the EEOC's fourth set of expert reports under Rule 37(c)(1), the EEOC fares no better.  The EEOC lumps this fourth set of reports in with the Third Murphy Report in arguing that exclusion was improper.  *See* EEOC Br. 38.  The case for exclusion is, however, even stronger for the fourth set of reports than for the Third Murphy Report because they were served on Freeman months after the summary judgment

45

briefing had closed, and Freeman has had no opportunity whatsoever to respond. The district court was well within its discretion to reject the EEOC's attempt to proffer yet another round of new reports at the hearing, when the EEOC already "squandered" its "chance to respond" to Freeman's criticisms of Murphy.  JA-1074.

## III.   THE EEOC DID NOT MEET ITS BURDEN TO ISOLATE A PARTICULAR EMPLOYMENT PRACTICE THAT CAUSED A DISPARATE IMPACT.

A disparate impact plaintiff "must begin by identifying the specific employment practice that is challenged."  *Watson*, 487 U.S. at 994 (plurality). Thus, Title VII provides that a plaintiff must "demonstrate[] that a respondent uses a *particular* employment practice that causes a disparate impact."  42 U.S.C. § 2000e-2(k)(1)(A)(i) (emphasis added).  This "is not a trivial burden."  *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 101 (2008).  It is not enough to "point to a generalized policy that leads to" disparate impact.  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005).  There is only one circumstance in which the statute allows the plaintiff to avoid showing "that each particular challenged employment practice causes a disparate impact."  42 U.S.C. § 2000e-2(k)(1)(B)(i). That is if the plaintiff "can demonstrate to the court that the elements of a respondent's decision-making process are not capable of separation for analysis." *Id.*  The EEOC has not attempted to make this showing.

46

Because the EEOC did not establish a *prima facie* case of disparate impact, this Court need not reach this issue. The district court correctly held, however, that the EEOC failed to meet this initial burden. JA-1070-JA-1072.

Freeman's criminal history criteria combine subjective and objective elements and are constituted of several different particular employment practices. One employment practice—and the only automatic disqualifier—excluded any applicant who failed to disclose or seriously misrepresented a conviction. JA-1051. A second employment practice usually denied hire if the applicant failed to clear up an outstanding warrant. JA-1051. The criminal history policy also checked for certain criminal convictions within the preceding seven years. JA-1051; *see* JA-105. Finally, Freeman maintained a subjective employment practice that allowed it to hire an applicant notwithstanding disqualifying convictions if there were sufficiently mitigating circumstances. JA-289; JA-667-JA-669. Freeman's credit history criteria likewise combined subjective and objective elements, including credit events that were presumptively disqualifying, JA-1052, and consideration of mitigating circumstances, JA-289. Freeman provided the EEOC with documentation of which particular hiring criterion an applicant failed to meet. *See, e.g.*, JA-1835-JA-1897; JA-1946-JA-2041.

The EEOC failed to isolate and identify "each particular challenged employment practice" in several respects. The EEOC did not even attempt to

47

show that use of prior convictions—the most prominent feature of Freeman's criminal history criteria—caused any disparate impact. Much less did it identify each objective "selection criterion" that causes a disparate impact. *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002). In *Stout*, the Ninth Circuit "doubt[ed] that the overall screening process" for selecting interviewees "should be treated as one employment practice" when it "included several discrete elements," such as each of eleven competencies on which an applicant was evaluated, but did not ultimately decide the issue. *Id.* at 1124-1125. Furthermore, the EEOC did not attempt to separate subjective and objective criteria, which the Supreme Court has mandated as "[e]specially" important. *Watson*, 487 U.S. at 994 (plurality).

It is not enough to point to an aggregation of discrete elements simply because they "share a common characteristic"—here, some connection to criminal or credit history. *Davis v. Cintas Corp.*, 717 F.3d 476, 496 (6th Cir. 2013). Because "the language that deals with the 'employment practice' is entirely in the singular, not the plural," in Title VII, this "syntax would be strange if a plaintiff could bundle a number of discrete steps of a multi-phase hiring process together, based on a common characteristic." *Id.* Title VII thus mandates that the EEOC isolate and identify which particular employment practice causes the disparate impact that it alleges—or prove that the elements are incapable of separation. The EEOC has done neither.

48

The EEOC primarily contends that any element more specific than the employer's decision-making process as a whole constitutes a specific employment practice. EEOC Br. 29-32. But the Supreme Court has expressly rejected that view, holding that "it is not enough simply to allege that there is a disparate impact on workers"—*i.e.*, bottom line statistics—"*or* point to a generalized policy that leads to such an impact." *Smith*, 544 U.S. at 241 (emphasis added). Moreover, it does not square with the statute's terms. By allowing resort to the overall decision-making process only when "the elements … are not capable of separation for analysis," 42 U.S.C. § 2000e-2(k)(1)(B)(i), the statute confirms that "particular employment practice" refers to any discrete, separable element of the process.

The EEOC claims the district court's decision would require it to isolate the effect of each question in a standardized test, EEOC Br. 30, but that is a wholly inapt analogy. A test results in only one input into the selection process; if an applicant does better on one test question, she can make up for doing worse on others, and the result is a single composite score. In contrast, an applicant cannot do better on one objective criminal history criterion and thereby make up for another.

None of the authority the EEOC cites furthers its cause. *See* EEOC Br. 31-33. The unpublished out-of-circuit decision on which the EEOC principally relies, *Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x 133 (3d Cir. 2010), is not about

49

the "particular employment practice" requirement at all, but addresses whether it was proper to aggregate several rounds of hiring for analysis. *See id.* at 145. In *Anderson*, this Court simply assumed *arguendo* that the plaintiff had isolated a particular employment practice. 406 F.3d at 265-66. *Smith* hurts rather than helps the EEOC, because it again reiterates that a plaintiff must identify the particular test *within* a general policy that causes a disparate impact. Finally, the EEOC insists that *Bennett*, 656 F.3d at 817, only required the plaintiff to identify elements, not sub-elements, of its hiring process. But the truthfulness, pending warrant, and conviction hiring criteria are not "sub-elements" simply because the EEOC says so. Because they operate independently of one another, they are separate elements of the hiring process.

Nor does the legislative history provide any help. *See* EEOC Br. 34. Congress has expressly provided that nothing but the interpretive memorandum should be considered as legislative history, so the EEOC's reliance on floor statements is precluded by statute. *See* Civil Rights Act of 1991, § 105(b), 105 Stat. 1071, 1075. The interpretive memorandum states that "functionally-integrated practices which are components of the same criterion … may be analyzed as one employment practice," citing the example of the height and weight standards designed to measure strength in *Dothard*. 137 CONG. REC. S15,276 (daily ed. Oct. 25, 1991). Yet the various hiring criteria at issue here are not

50

functionally integrated components of the same criterion. Instead, they are designed to measure specific, but different characteristics—*e.g.*, truthfulness, propensity to violence, likelihood of theft—such that, unlike in *Dothard*, they could not be replaced with a single test that measured the one targeted characteristic directly. *See* 433 U.S. at 332.

The EEOC then insists it was wrong of the district court to address this issue at summary judgment, but provides no reason to doubt the district court's conclusion that the EEOC had "made no effort to break down what is clearly a multi-faceted, multi-step policy." JA-1072. Rather than attempt to meet the burden, the EEOC repudiated it, with Murphy declining to conduct any such analysis because in his view it was not necessary and contrary to his view of certain standards. EEOC Br. 34-35. That is a non-sequitur. Regardless of Murphy's view, the statute *requires* the EEOC to isolate the particular employment practice that causes the disparate impact unless the elements are not capable of separation for analysis.

That Freeman did not prove that isolating the particular employment practice would eliminate all disparate impact, EEOC Br. 35-36, is wholly beside the point. Even if there were disparate impact, the particularized analysis would determine *which* practices Freeman was obliged to defend as job-related. 42 U.S.C. § 2000e-2(k)(1)(A)(i). The EEOC seeks to impermissibly broaden Freeman's burden to

51

prove job-relatedness by depriving Freeman of the ability to ascertain for which practices it must establish job-relatedness:  The requirement of truthfulness? Presumptive disqualification for a pending warrant? Presumptive disqualification for certain crimes?  The EEOC's evidence does not say.

Finally, the requirement to isolate a particular employment practice has nothing to do with the disaggregation of data.  *See* EEOC Br. 36-38.  In any event, the EEOC introduced no evidence that analyzing the effects of each specific employment practice separately would, in fact, result in a statistical sample too small to be reliable.  The EEOC's unsupported refrain that it would be more difficult to establish disparate impact if it were required to isolate which element of Freeman's hiring process causes that impact cannot absolve the EEOC of the statutory requirement to make that showing.

## IV.  THE DISTRICT COURT PROPERLY DISMISSED TIME-BARRED CLAIMS.

### A. The District Court Properly Limited The Liability Period To 300 Days Before The Charge.

#### 1.    *The EEOC's Litigation Authority Is Subject to the Procedures in Section 706.*

The EEOC's 2009 complaint sought relief for individuals who had been denied employment since 2001.  JA-49.  In a straightforward application of statutory text, the district court rejected as untimely the EEOC's attempt to recover for hiring decisions before March 23, 2007, because no charge was filed "within

300 days after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e-5(e)(1), for any of those failures to hire. *See* JA-48-JA-59. The timely charge-filing requirement appears in Section 706 of Title VII, but is incorporated into Section 707, which requires the EEOC to conduct pattern-or-practice actions "in accordance with the procedures set forth in [Section 706] of this title." *Id.* § 2000e-6(e).

The EEOC contends, however, that no requirement of a timely charge—and therefore no limitations period—applies to its suits under Section 707. The district court properly refused the EEOC's invitation to "extend or truncate Congress' deadlines," heeding the Supreme Court's admonition that it "must give effect to the statute as enacted." *Ledbetter v. Goodyear Tire & Rubber Co*., 550 U.S. 618, 629, 630 (2007)*, superseded by statute on other grounds*, 42 U.S.C. § 2000e-5(e)(3)(A).

*First*, the EEOC contends that Section 707(e) refers only to the EEOC's administrative process, and not its litigation process. EEOC Br. 62. Even if so, it would not help the EEOC, because it is within the administrative stage of Title VII's "integrated, multistep enforcement procedure," *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 359 (1977), that the statute of limitations is imposed, *see id.* at 372.

Moreover, Section 707(e) plainly refers to the EEOC's authority both to "investigate" *and* to "act on a charge." 42 U.S.C. § 2000e-6(e). The EEOC's

53

proposed narrowing of the term "act on a charge" to mean the administrative process is without textual basis. Section 707(e) imposes Section 706 procedures on all pattern-or-practice "actions," a term that most naturally refers to civil actions. 42 U.S.C. § 2000e-6(e).[4] The EEOC insists that it would be anomalous for the EEOC to be subject to a limitations period when the Department of Justice is not. EEOC Br. 62-64. This objection ignores the statutory scheme which plainly evidences congressional intent to channel EEOC pattern-and-practice claims (but not Department of Justice claims) through the EEOC's Section 706 procedures. *See* 42 U.S.C. § 2000e-6(c) (requiring the EEOC alone to "carry out" all of the functions transferred from the Attorney General "in accordance with subsection[] … (e)" of Section 707).

There is therefore no "conundrum" as to how the limitations period would apply if there were no charge, EEOC Br. 64 n.8, because a charge is required to initiate a Section 707 case. Moreover, the EEOC's argument to the contrary is forfeited, because it is the opposite of the argument it made before the district court. There the EEOC's counsel "agree[d] with the defendant that in order to trigger an investigation that would lead to a pattern or practice lawsuit, the EEOC requires a charge that is timely." Tr. 26, Mar. 1, 2010, ECF No. 17. Further, no

---

[4] Indeed, in other cases the EEOC has recognized that Section 707(e) subjects "all EEOC litigation [to] the same administrative prerequisites." *See* Br. for the EEOC, *EEOC v. CRST Van Expedited*, Nos. 09-3764 et al. (8th Cir. filed Aug. 12, 2010).

authority supports the new position the EEOC takes on appeal.  The case cited by the EEOC, *Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012), states only that the EEOC can bring suit under Section 707 "without first receiving a charge filed by *an aggrieved individual*."  *Id.* at 896 (emphasis added).  That is true, because Section 707 reiterates that a Commissioner may make the charge, 42 U.S.C. § 2000e-6(e), but it provides no support to the EEOC's reversal of position on appeal regarding the necessity of *some* charge.

*Second*, the EEOC insists that any limitations period cannot be squared with the back pay limit in Section 706(g), 42 U.S.C. § 2000e-5(g)(1).  EEOC Br. 62-63.  That argument is self-defeating and internally contradictory.  The EEOC claims that the back pay limit applies, EEOC Br. 66, presumably because it wants to avoid the natural consequences of its no-statute-of-limitations reading—that the EEOC's right to recover extends to the enactment of Title VII.  However, because the EEOC contends that no litigation procedures from Section 706 are incorporated into Section 707, EEOC Br. 62, it cannot also argue that the back pay limitation— which is a litigation procedure that appears only in *Section 706*—applies to its 707 suits.[5]  The EEOC nowhere explains what plausible statutory construction allows it to interpret "in accordance with the procedures set forth in [Section 706]" to reach

---

[5] In the district court, the EEOC expressly disavowed the argument it is now making.  *See*  Tr. 42, Mar. 1, 2010, ECF No. 17 (EEOC counsel: "To the extent that we stated that Section 706(g)'s two year back pay period would apply in this case, that was - - the EEOC withdraws those statements.").

the back pay limitation period, but not the charge-filing period.  There is none.

Both of those provisions—as well as all of the other procedures in Section 706—

are incorporated into Section 707 through Section 707(e).

Moreover, there is no inconsistency between a 300-day charge filing period

and a two-year back pay limitation.  Indeed, both plainly coexist within Section

706 without difficulty.  The EEOC rests this purported inconsistency on *National

Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), but *Morgan*

undermines, rather than supports, the EEOC's position.  The *Morgan* Court

rejected the claim that a discrete act occurring before the 300-day period, such as a

failure to hire, was actionable simply because it was "related to acts alleged in

timely filed charges," *id.* at 113, notwithstanding the two-year back pay limitation,

*id.* at 119.

*Third*, the weight of authority is against the EEOC's position.  The EEOC

notes a divide in the district courts, EEOC Br. 65-66, but the split is a lopsided one.

The majority of district courts have rejected the EEOC's attempt to eliminate any

statute of limitations for its Section 707 litigation.[6]  Indeed, one of the few district

courts on which the EEOC relies has since reversed position.  *See Global*

_____

[6] *See, e.g*., *EEOC v. Global Horizons*, 904 F. Supp. 2d 1074, 1091-1092 (D. Haw. 2012) (holding that the charge-filing period applies to the EEOC under Section 707 and collecting six cases decided in 2012 uniformly reaching same holding); *EEOC v. U.S. Steel Corp.*, No. 10-1284, 2012 WL 3017869, at *5 (W.D. Penn. July 23, 2012) (collecting ten additional cases reaching the same holding before 2012).

56

*Horizons*, 904 F. Supp. 2d at 1091-92 (rejecting view previously taken in *EEOC v. Scolari Warehouse Mkts., Inc.*, 488 F. Supp. 2d 1117, 1136 (D. Nev. 2007)).

The EEOC also relies on two inapposite cases from the courts of appeals, EEOC Br. 64-66, neither of which justifies eschewing the statutory text. The Fifth Circuit case concluded based on legislative history alone that the Section 706 intervention procedure did not apply in Section 707 cases. *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 843-44 (5th Cir. 1975). Its conclusion that Section 707(e) assimilated only administrative procedures, *id.* at 844, does not help the EEOC because the statute of limitations is part of the administrative procedures. The Ninth Circuit case merely asserted in dicta that "[n]ot all procedures listed in s 706 … are necessarily relevant in pattern or practice litigation," but did not decide the question. *United States v. Fresno Unified School Dist.*, 592 F.2d 1088, 1096 (9th Cir. 1979).

As the Supreme Court has repeatedly cautioned, "experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980). The EEOC offers no reason to disturb the district court's adherence to Title VII's plain text.

57

## 2.   *The Continuing Violation Doctrine Does Not Apply.*

The EEOC's contention that the "continuing violation" doctrine saves the stale claims is refuted by binding precedent. Although *Morgan* reserved the "timely filing question" with respect to pattern-or-practice suits, it rejected any deference to the EEOC's view that "systemic violations constitute continuing violations that allow relief for untimely events." 536 U.S. at 111 n.6. Rather, it relied on a pattern-or-practice case to hold that each discrete act under a discriminatory practice is a separately actionable wrong. *Id.* at 111-12 (citing *Bazemore*, 478 U.S. at 395). Moreover, this Court after *Morgan* has rejected the argument that an alleged pattern or practice of discrimination converts a series of discrete acts into one continuing violation. *Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004). This Court's view is consistent with that of every circuit to consider the question after *Morgan*. *Chin v. Port Authority of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) (collecting cases). None of those cases involved class or EEOC pattern-or-practice claims, but the reasoning that discrete acts do not constitute a continuing violation even when they are incidents of the same pattern applies with equal force regardless of the form of the action.

Moreover, the EEOC ignores *Lewis v. City of Chicago*, 560 U.S. 205 (2010), which establishes that even in a classwide disparate impact case, each "use" of a challenged facially neutral employment practice is a discrete act separately

58

actionable from adoption of the policy itself.  In *Lewis*, the Court addressed a policy specifying how applicants who scored "qualified" on a test would be hired. 560 U.S. at 209.  The Supreme Court accepted that the adoption of the policy may have given "rise to a freestanding disparate-impact claim," but held that "since no timely charge was filed attacking it, the City is now entitled to treat that past act as lawful." *Id.* at 214.  The City was, however, potentially subject to liability for each subsequent "use" of that policy if timely charges were filed. *Id.* at 212.  The Court thus held that the adoption of the policy and each use of it were discrete actionable wrongs.  That means, under *Morgan*, that they do not collectively amount to a "continuing violation."

## B. The District Court Correctly Based Freeman's Criminal History Liability Period On The EEOC's Notice Of An Expanded Investigation.

The charge that instigated the EEOC investigation did not allege that Freeman discriminated by use of criminal history criteria.  JA-135; *see* JA-72. Instead, the EEOC subsequently expanded its investigation to include the criminal history criteria.  JA-128; *see* JA-74.  The district court held that the EEOC could not recover for individuals denied hire based on the criminal history criteria prior to November 30, 2007, the date 300 days before the EEOC provided Freeman notice of the expanded investigation.  JA-131-JA-132.

59

That holding is a straightforward application of this Court's law, which allows the EEOC to satisfy the charge-filing requirement without a new charge when a new claim "grows reasonably out of the investigation of the initial charge," *EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 368 (4th Cir. 1976), but provides that the employer should not be prejudiced by the expansion, *id.* at 372 (interpreting back pay limitation, which runs from "the filing of a charge," 42 U.S.C. § 2000e-5(g)(1) to run from notice of an expanded investigation). The district court's view is also consistent with the approach taken by other district courts, and the EEOC points to no contrary authority. *See, e.g.*, *Arizona ex rel. Goddard v. GEO Group, Inc.*, No. Civ. 10-1995-PHX-SRB, 2013 U.S. Dist. LEXIS 49277, *61 (D. Ariz. Mar. 25, 2013); *EEOC v. Princeton Healthcare Sys.*, No. 10-4126 (PGS), 2012 WL 5185030, *5 (D.N.J. Oct. 18, 2012); *EEOC v. Optical Cable Corp.*, 169 F. Supp. 2d 539, 547 (W.D. Va. 2001)

The EEOC contends there is a textual distinction between the timely charge-filing requirement and the back pay limitation. EEOC Br. 68-69. Both statutory provisions, however, refer to the "charge." And both requirements operate to limit recovery based on the charge-filing date. *Morgan*, 536 U.S. at 120 (timely charge filing provision "has the consequence of limiting liability"). Thus, the district court properly concluded that just as "employers must not be burdened with larger back pay awards than would result if a new charge were required," they "should

60

not be burdened with additional claims than would result if a new charge were required upon the expansion of an investigation." JA-132.

As for any "countervailing equities," this issue falls within "the discretion of the trial court." *Gen. Elec. Co.*, 532 F.2d at 372. The district court specifically considered and rejected the claims the EEOC repeats here, finding that "[e]ven a cursory review of Vaughn's charge disaffirms th[e] assertion" that it provided notice of the expanded investigation, JA-135, that Freeman did not have knowledge of the expansion prior to the notice, JA-136, and that information was exchanged regarding the criminal history criteria because it was relevant to the credit history claim, JA-136. The EEOC does not advert to Freeman's summary judgment evidence on this point, and does not attempt to show those conclusions were an abuse of discretion. Indeed, it would be nonsensical for the EEOC to send Freeman notice of the expanded investigation if, as the EEOC contends, all parties were aware from the beginning that the EEOC was investigating Freeman's use of criminal history criteria.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

April 2, 2014                                  Respectfully submitted,


                                               s/Donald R. Livingston
                                               Donald R. Livingston
                                               W. Randolph Teslik
                                               Hyland Hunt
                                               John T. Koerner
                                               AKIN GUMP STRAUSS HAUER & FELD LLP
                                               1333 New Hampshire Ave. NW
                                               Washington, DC 20036
                                               Tel.: 202-887-4000
                                               Fax: 202-887-4288
                                               Email: dlivingston@akingump.com


*Attorneys for Appellee Freeman*

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 13,991 words, and thus complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

s/Hyland Hunt
Hyland Hunt

April 2, 2014

## CERTIFICATE OF SERVICE

I hereby certify that, on April 2, 2014, I served the foregoing brief upon the following counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system:

P. David Lopez
Lorraine C. Davis
Jennifer S. Goldstein
Anne Noel Occhialino
U.S. Equal Employment Opportunity Commission
Office of General Counsel
131 M. St., NE, 5th Fl.
Washington, D.C. 20507
(202) 663-4724
(202) 663-7090


s/Hyland Hunt
Hyland Hunt

64

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

42 U.S.C. § 2000e-2(k) .......................................................................1a

42 U.S.C. § 2000e-5 ...........................................................................3a

42 U.S.C. § 2000e-6 .........................................................................10a

**United States Code**
**Title 42. The Public Health and Welfare**
**Chapter 21. Civil Rights**
**Subchapter VI. Equal Employment Opportunities**

* * * * *

**§ 2000e-2. Unlawful employment practices**

**\*\*\***

**(k)** Burden of proof in disparate impact cases

**(1)(A)** An unlawful employment practice based on disparate impact is established under this subchapter only if--

**(i)** a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

**(ii)** the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

**(B)(i)** With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

**(ii)** If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

**(C)** The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

1a

**(2)** A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

**(3)** Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act [21 U.S.C. § 801 et seq.] or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

* * * * *

**United States Code**
**Title 42. The Public Health and Welfare**
**Chapter 21. Civil Rights**
**Subchapter VI. Equal Employment Opportunities**

\* \* \* \* \*

## § 2000e-5. Enforcement provisions

**(a)** Power of Commission to prevent unlawful employment practices

The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e-2 or 2000e-3 of this title.

**(b)** Charges by persons aggrieved or member of Commission of unlawful employment practices by employers, etc.; filing; allegations; notice to respondent; contents of notice; investigation by Commission; contents of charges; prohibition on disclosure of charges; determination of reasonable cause; conference, conciliation, and persuasion for elimination of unlawful practices; prohibition on disclosure of informal endeavors to end unlawful practices; use of evidence in subsequent proceedings; penalties for disclosure of information; time for determination of reasonable cause

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the

3a

requirements of subsections (c) and (d) of this section. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection (c) or (d) of this section, from the date upon which the Commission is authorized to take action with respect to the charge.

**(c)** State or local enforcement proceedings; notification of State or local authority; time for filing charges with Commission; commencement of proceedings

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

**(d)** State or local enforcement proceedings; notification of State or local authority; time for action on charges by Commission

In the case of any charge filed by a member of the Commission alleging an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and

establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days (provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged.

**(e)** Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency; seniority system

**(1)** A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

**(2)** For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

**(3)(A)** For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or

other compensation is paid, resulting in whole or in part from such a decision or other practice.

**(B)** In addition to any relief authorized by section 1981a of this title, liability may accrue and an aggrieved person may obtain relief as provided in subsection (g)(1), including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

**(f)** Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master

**(1)** If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or

6a

political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsection (c) or (d) of this section or further efforts of the Commission to obtain voluntary compliance.

**(2)** Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. It shall be the duty of a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to be in every way expedited.

**(3)** Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of Title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

**(4)** It shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

**(5)** It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure.

**(g)** Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders

**(1)** If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

**(2)(A)** No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title.

8a

**(B)** On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court--

**(i)** may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title; and

**(ii)** shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

**(h)** Provisions of chapter 6 of Title 29 not applicable to civil actions for prevention of unlawful practices

The provisions of chapter 6 of Title 29 shall not apply with respect to civil actions brought under this section.

**(i)** Proceedings by Commission to compel compliance with judicial orders

In any case in which an employer, employment agency, or labor organization fails to comply with an order of a court issued in a civil action brought under this section, the Commission may commence proceedings to compel compliance with such order.

**(j)** Appeals

Any civil action brought under this section and any proceedings brought under subsection (i) of this section shall be subject to appeal as provided in sections 1291 and 1292, Title 28.

**(k)** Attorney's fee; liability of Commission and United States for costs

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

* * * * *

**United States Code**
**Title 42. The Public Health and Welfare**
**Chapter 21. Civil Rights**
**Subchapter VI. Equal Employment Opportunities**

**§ 2000e-6. Civil actions by the Attorney General**

**(a)** Complaint

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

**(b)** Jurisdiction; three-judge district court for cases of general public importance: hearing, determination, expedition of action, review by Supreme Court; single judge district court: hearing, determination, expedition of action

The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, and in any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case

10a

to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

**(c)** Transfer of functions, etc., to Commission; effective date; prerequisite to transfer; execution of functions by Commission

Effective two years after March 24, 1972, the functions of the Attorney General under this section shall be transferred to the Commission, together with such personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available, or to be made available in connection with such functions unless the President submits, and neither House of Congress vetoes, a reorganization plan pursuant to chapter 9 of Title 5, inconsistent with the provisions of this subsection. The Commission shall carry out such functions in accordance with subsections (d) and (e) of this section.

**(d)** Transfer of functions, etc., not to affect suits commenced pursuant to this section prior to date of transfer

Upon the transfer of functions provided for in subsection (c) of this section, in all suits commenced pursuant to this section prior to the date of such transfer, proceedings shall continue without abatement, all court orders and decrees shall remain in effect, and the Commission shall be substituted as a party for the United States of America, the Attorney General, or the Acting Attorney General, as appropriate.

**(e)** Investigation and action by Commission pursuant to filing of charge of discrimination; procedure

11a

Subsequent to March 24, 1972, the Commission shall have authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission. All such actions shall be conducted in accordance with the procedures set forth in section 2000e-5 of this title.

* * * * *